**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

FIRST MERCURY INSURANCE
COMPANY,

     Plaintiff - Counter/Defendant -
     Appellant/Cross - Appellee,

v.

CINCINNATI INSURANCE COMPANY,

     Defendant - Counter/Plaintiff -
     Appellee/Cross - Appellant.

Nos. 17-2006
and 17-2010

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:14-CV-01052-WJ-LAM)**
_____

Gregory D. Steinman, Madison, Mroz, Steinman & Dekleva, P.A., Albuquerque, New
Mexico, for First Mercury Insurance Company.

Timothy L. Fields (Nathan T. Nieman and Elizabeth A. Martinez with him on the briefs),
Modrall Sperling Roehl Harris & Sisk, P.A., Albuquerque, New Mexico, for Cincinnati
Insurance Company.

_____

Before **BACHARACH**, **MURPHY**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

This appeal asks us to settle a dispute between insurers over coverage for the defense and indemnification of a wrongful death action brought in a separate lawsuit. First Mercury Insurance Company ("First Mercury") assumed the duty to defend the wrongful death suit against Bingham Construction Company ("Bingham"), with a reservation of rights. First Mercury then filed a complaint for declaratory judgment in federal district court for the District of New Mexico against Cincinnati Insurance Company ("Cincinnati"), seeking a declaration that it had no obligation to indemnify Bingham, and that Cincinnati had an obligation to reimburse First Mercury for the costs of defense. First Mercury argued, among other things, that the underlying contract between Bingham and High Desert Roofing, Inc. ("High Desert"), the subcontractor, was void under New Mexico Stat. Ann. § 56-7-1, and that even if valid, the policy did not cover the wrongful death action.

The parties eventually filed cross-motions for summary judgment. The district court ruled that First Mercury had a duty to defend and indemnify Bingham and that Cincinnati had no obligation to reimburse any part of the settlement amount or the defense costs. First Mercury now appeals, and Cincinnati has filed a conditional cross-appeal. We affirm the district court's order, although we do so on different grounds. We therefore do not address the issues raised in Cincinnati's conditional cross-appeal.

2

# I. BACKGROUND

## A. *Factual History*

### 1. The Subcontract Agreement

In July 2012, Bingham entered into a construction agreement ("subcontract agreement") with High Desert for roofing services to be performed by High Desert at a tractor supply store in Farmington, New Mexico. The subcontract agreement requires High Desert to procure and maintain an insurance policy relating to its work on the tractor supply store and to add Bingham as an additional insured on that policy. These conditions are set forth in the following provisions of the subcontract agreement:

**ARTICLE 12. INSURANCE AND INDEMNITY**

(a) Before commencing any of its work under this Subcontract, and until completion and final acceptance thereof by Contractor [Bingham] and Owner, Subcontractor [High Desert] shall maintain at its expense such insurance as will protect it from the claims arising out of its operations and the expiration of the period described below in this subparagraph (a) under this Subcontract . . . .

The insurance coverage required under this article shall be of sufficient type, scope, and duration to ensure coverage for the Contractor [Bingham] or Owner for liability related to any manifestation date within the applicable statute of limitations which pertain to any work performed by or on behalf of the Contractor [Bingham] or Owner in relation to the work under this Subcontract. Subcontractor [High Desert] agrees to maintain the above insurance for the benefit of Contractor [Bingham] and Owner for a period of five years or the expiration of the applicable statute of limitation under Texas Civil Practice and Remedies code, chapter 16, whichever is longer.

. . . .

3

(d) The insurance policies . . . shall be endorsed to add the Contractor [Bingham], the Owner and their parent companies, subsidiaries and affiliated companies as additional insureds on a primary and non-contributory basis and shall be endorsed to provide notice to the Contractor [Bingham], in writing, by registered mail, at least thirty (30) days prior to the termination and before any changes are made in any policy which change restricts or reduces the insurance provided. The insurance carried by Subcontractor [High Desert] naming Contactor [Bingham] and the Owner as additional insureds shall be primary over any insurance policies carried by Contractor [Bingham] and the Owner. The Additional Insured endorsement on the Subcontractor's General Liability policy shall include coverage for "products and completed operations" of the Additional Insureds (Contractor [Bingham], the Owner and their parent companies, subsidiaries and affiliated companies).

. . . It is the intent of this Agreement that Additional Insured status shall include coverage for completed operations, ongoing operations and for the concurrent or sole negligence of Contractor [Bingham], the Owner, and their respective parent companies, subsidiaries, and affiliated companies.

App. III at 250–51.

In addition to the foregoing provisions, the subcontract agreement contains a number of indemnity clauses, including the following:

(k) SUBCONTRACTOR [HIGH DESERT] SHALL ALSO DEFEND, INDEMNIFY, AND HOLD HARMLESS CONTRACTOR [BINGHAM], OWNER, AND CONTRACTOR [BINGHAM]'S OTHER INDEMNITEES (AND THEIR OFFICERS, DIRECTORS, SHAREHOLDERS, AGENTS AND EMPLOYEES) (HEREINAFTER COLLECTIVELY REFERRED TO AS "INDEMNIFIED PARTIES") FROM AND AGAINST ANY [AND] ALL CLAIMS, CAUSES OF ACTION (INCLUDING STRICT LIABILITY), LAWSUITS, JUDGMENTS, AND LIABILITY OF EVERY KIND, INCLUDING ALL EXPENSES OF LITIGATION, COURT COSTS, AND ATTORNEY'S FEES, FOR INJURY TO OR DEATH OF ANY PERSON (INCLUDING WITHOUT LIMITATION, SUBCONTRACTOR [HIGH DESERT]'S EMPLOYEES), AND FOR DAMAGES TO ANY PROPERTY, ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THE OPERATIONS, PERFORMANCE, OR ACTS OR OMISSIONS OF SUBCONTRACTOR [HIGH DESERT] (INCLUDING ALL EMPLOYEES, SUB-SUBCONTRACTORS, SUPPLIERS AND OTHERS FOR WHOM SUBCONTRACTOR IS RESPONSIBLE),

4

OR THE WORK PERFORMED OR TO BE PERFORMED BY SUBCONTRACTOR [HIGH DESERT]. SUBCONTRACTOR [HIGH DESERT]'S ABOVE STATED DUTY TO INDEMNIFY EXTENDS TO CLAIMS CAUSED OR ALLEGED TO BE CAUSED, IN WHOLE OR IN PART, BY THE NEGLIGENCE OF AN INDEMNIFIED PARTY. . . . WITHOUT RELIEVING SUBCONTRACTOR [HIGH DESERT] OF ITS OBLIGATIONS HEREUNDER, ANY OF THE INDEMNIFIED PARTIES, AT THEIR ELECTION, MAY DEFEND OR PARTICIPATE IN THE DEFENSE OF ANY CLAIM TO WHICH SUBCONTRACTOR [HIGH DESERT]'S DUTY TO DEFEND EXTENDS.

. . . .

(P) NOTE: THESE INDEMNIFICATION OBLIGATIONS INCLUDE INDEMNIFYING THE INDEMNITIES [SIC] FOR THEIR OWN NEGLIGENCE, WHETHER SOLE OR CONCURRENT.

*Id.* at 252.

## 2. The Insurance Policies

In accordance with the subcontract agreement, High Desert obtained an insurance policy from First Mercury. First Mercury issued High Desert policy number IL-CGL-0000003261-01 (the "First Mercury Policy"), which, barring exclusions, provides High Desert commercial general liability coverage. The general liability provisions cover, among other things, "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and create a "duty [for First Mercury] to defend the insured against any 'suit' seeking those damages."[1] App. I at 94. The First Mercury

---

[1] The First Mercury Policy excludes coverage for "bodily injury" "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." App. I at 95. But the policy specifically indicates that this exclusion does not apply to liability for damages "[a]ssumed in a contract or agreement that is an 'insured contract,'" so long as the "bodily injury" occurs "subsequent to the execution of the contract or agreement." *Id.* First Mercury does

5

Policy also includes an endorsement regarding additional insureds ("Additional Insureds Endorsement") that provides automatic additional insured status to persons or organization "[a]s required by written contract signed by both parties prior to loss." *Id.* at 106. That endorsement provides:

**ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION**

. . . .

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your [High Desert's] acts or omissions; or

**2.** The acts or omissions of those acting on your [High Desert's] behalf;

in the performance of your [High Desert's] ongoing operations for the additional insured(s) at the location(s) designated above.

*Id.*

The First Mercury Policy also contains another endorsement, entitled "Primary and Non-Contributing Insurance," which provides that the policy is primary over any other insurance when required by a written contract. In relevant part, the endorsement provides:

---

not dispute that the subcontract agreement constitutes an "insured contract" as defined in the First Mercury Policy.

6

**4. Other Insurance**

If all of the other insurance permits contribution by equal shares, we will follow this method unless the insured is required by written contract signed by both parties, to provide insurance that is primary and noncontributory, and the "insured contract" is executed prior to any loss. Where required by a written contract signed by both parties, this insurance will be primary & non-contributing only when and to the extent as required by that contract.

However, under the contributory approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

App. II at 179. Thereafter, First Mercury provided Bingham a certificate of insurance that describes the coverage purchased by High Desert as follows:

The general liability policy includes a blanket automatic additional insured endorsement . . . that provides additional insured status to the certificate holder [Bingham] only when there is a written contract between the named insured [High Desert] and the certificate holder [Bingham] that require[s] such status. The general liability policy includes a blanket automatic waiver of subrogation endorsement . . . that provides such status to the certificate holder [Bingham] only when there is a written contract between the named insured [High Desert] and the certificate holder [Bingham] that requires such status. The general liability policy includes a blanket automatic additional insured endorsement . . . that contains the Primary and Non-Contributory wording.

*Id.* at 178.

Bingham obtained its own general commercial liability insurance from Cincinnati in the form of policy number EPP 010 47 24 (the "Cincinnati Policy").

Under the section entitled "Commercial General Liability Coverage Form," the Cincinnati Policy states:

**5. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** or **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** of this Coverage Part, our obligations are limited as follows:

. . . .

**b. Excess Insurance**

This insurance is excess over:

. . . .

(2) Any other primary insurance available to the insured [Bingham] covering liability for damages arising out of the premises or operations, or the products and completed operations, for which the insured [Bingham] has been added as an additional insured by attachment of an endorsement.

. . . .

When this insurance is excess, we will have no duty under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** or **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** to defend the insured [Bingham] against any "suit" if any other insurer has a duty to defend the insured [Bingham] against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance . . . .

App. I at 91–92.

### 3. The Wrongful Death Lawsuit

On September 4, 2012, High Desert employee Jose Corona fell through a hole in the vestibule attic of the tractor supply store, landing on the concrete twenty feet below. He died shortly thereafter. The hole was allegedly cut into the steel flooring of the vestibule attic by a Bingham employee and was subsequently covered with two pieces of ill-fitting plywood. The hole was not marked or otherwise identified. Mr. Corona was not wearing fall protection at the time of the accident. Additionally, the president of High Desert confirmed that High Desert knew of the hole in the vestibule attic floor and that it had requested Mr. Corona to examine the hole, determine why it was there, and evaluate whether High Desert employees were to use it as an access point to the attic.

Following Mr. Corona's death, his personal representative filed a wrongful death suit in New Mexico state court against Bingham. Bingham was the only defendant named in the lawsuit and the operative complaint addressed only Bingham's alleged negligence. Cincinnati initially defended Bingham in the suit, but on August 19, 2013, it tendered the defense of Bingham to First Mercury. First Mercury assumed Bingham's defense, but did so under a reservation of rights. By December 17, 2014, First Mercury offered to pay its entire policy limit toward settlement of the lawsuit and requested that Cincinnati reassume the duty to defend Bingham. Cincinnati declined. The lawsuit eventually settled for $4.2 million, of

9

which First Mercury paid its policy limit of $1 million and Cincinnati paid the remaining $3.2 million.[2]

## B. *Procedural History*

First Mercury filed the instant declaratory judgment action against Cincinnati and Bingham seeking declarations from the district court that (1) the subcontract agreement is void under the New Mexico Anti-Indemnity Statute and therefore First Mercury had no duty to defend or indemnify Bingham; (2) even if Bingham is an additional insured under the First Mercury Policy, the underlying lawsuit against Bingham fell outside the scope of the policy's coverage because it did not allege bodily injury caused by High Desert; and (3) even if First Mercury had a duty to defend and/or indemnify Bingham, Cincinnati shared that duty and therefore First Mercury was only obligated to pay a pro-rata share of the defense and settlement.[3]

The parties filed cross-motions for summary judgment. After briefing and argument, the district court granted and denied each motion in part, concluding there

---

[2] The dollar values of each policy's coverage and the value of the settlement have been corrected at various times during the proceedings. At the time the district court issued the final judgment, the court was under the impression that the settlement amount was $6 million, with First Mercury contributing $1 million and Cincinnati contributing $5 million. After final judgment was entered, First Mercury filed a motion to alter or amend the judgment in which it stated the settlement amount was actually $4.2 million ($1 million paid by First Mercury and $3.2 million paid by Cincinnati) but reaffirming that its policy limit was $1 million and Cincinnati's policy limit was $5 million. First Mercury again corrected the numbers in its opening brief, stating that its policy limit is $1 million and Cincinnati's policy limit is actually $6 million. For purposes of appeal, we need not resolve this discrepancy.

[3] The parties stipulated to dismissal of Bingham from the lawsuit.

was no basis for requiring Cincinnati to reimburse First Mercury for any portion of the $1 million paid toward settlement or the costs incurred in defending Bingham. The district court reasoned that although the provisions of the subcontract agreement requiring High Desert to indemnify Bingham for Bingham's own negligence are void under New Mexico's anti-indemnity statute, "other provisions in the [subcontract agreement] are not contrary to the statute and are therefore enforceable, including the provisions requiring High Desert to add Bingham . . . as an additional insured on High Desert's insurance policy." *First Mercury Ins. Co. v. Cincinnati Ins. Co.*, No. 1:14-CV-01052 WJ/LAM, 2016 WL 7494286, at *13 (D.N.M. Sept. 27, 2016). It also held that Bingham is an additional insured under the First Mercury Policy's Additional Insureds Endorsement and that the endorsement does not violate New Mexico's anti-indemnity statute. *Id.* The district court further determined that the coverage provided to Bingham by the First Mercury Policy is limited "to injuries that were caused [in whole or in part] by High Desert's acts or omission in performing its duties for Bingham" and that First Mercury had "no duty to cover Bingham for injury or damages caused by Bingham's own negligent acts or omissions." *Id.* at *12. But it also concluded that the First Mercury Policy was primary over the Cincinnati Policy with respect to the duty to defend and therefore First Mercury was obligated to defend Bingham because the underlying lawsuit was, at least in part, based on or implicated by High Desert's acts or omissions. *Id.* Finally, the district court held that First Mercury was the primary insurer with respect to injuries caused in whole or in part by High Desert's acts or omissions, but not with respect to claims asserted

11

against Bingham for its own acts or omissions. *Id.* However, "because fault was never apportioned in the underlying lawsuit," the district court concluded there was no basis to require Cincinnati to reimburse First Mercury for any of the $1 million First Mercury paid toward settlement. *Id.* at \*13.

After the district court entered final judgment, First Mercury filed a Motion to Alter or Amend the Judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. First Mercury argued the district court had mistakenly calculated the total settlement amount as $6 million—instead of the actual settlement amount of $4.2 million—and that this mistake altered the parties' financial obligations. Specifically, First Mercury asserted that under a pro-rata ratio based on the parties' policy limits, it should have been required to pay only $700,000 toward the settlement and that defense costs should have been similarly apportioned. The district court denied First Mercury's motion because First Mercury had failed to establish any of the recognized grounds for altering or amending a judgment under Rule 59, and also held that the correct settlement amount would not change the analysis of First Mercury's financial obligations. *See Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (setting forth grounds warranting the grant of a motion to reconsider). This appeal followed.

## II. DISCUSSION

First Mercury argues the district court erred in granting summary judgment in favor of Cincinnati. Specifically, First Mercury asserts the court incorrectly analyzed the subcontract agreement in light of New Mexico's anti-indemnity statute and

12

incorrectly analyzed the insurance policies. "We review summary judgment de novo and apply the same legal standard as the district court." *Philadelphia Indem. Ins. Co. v. Lexington Ins. Co.*, 845 F.3d 1330, 1336 (10th Cir. 2017). Because this is a diversity action, we apply the substantive law of the forum state and review the district court's interpretations of state law de novo. *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 850 (10th Cir. 2015); *see also Philadelphia Indem. Indem. Ins. Co.*, 845 F.3d at 1336–37.

We begin our analysis with First Mercury's argument that the subcontract agreement is void under the New Mexico anti-indemnity statute. Concluding that the subcontract agreement is not void and that Bingham is an additional insured under the First Mercury policy, we next address First Mercury's argument that the underlying lawsuit is not within the coverage provided by its policy. Because we conclude that the underlying lawsuit is covered, we then consider whether the First Mercury policy is primary over the Cincinnati policy. Finding that the First Mercury policy is primary, we examine whether Cincinnati should be ordered to reimburse any of the defense or indemnity costs associated with the underlying lawsuit and its settlement. For the reasons set forth below, we conclude that the district court was correct that Cincinnati is not obligated to reimburse First Mercury.

### A.  *New Mexico's Anti-Indemnity Statute*

First Mercury argues it has no duty to defend or indemnify Bingham in the underlying lawsuit because New Mexico's Anti-Indemnity Statute, N.M. Stat. Ann. § 56-7-1, invalidates the relevant portions of the Subcontract Agreement. Because the

13

subcontract is void, First Mercury reasons, Bingham is not a named insured under the First Mercury Policy's Additional Insureds Endorsement. According to First Mercury, Bingham could only be considered an additional insured under the terms of the endorsement if a separate, enforceable written contract signed by High Desert and Bingham specifically required that Bingham be named as an additional insured on the High Desert policy. Although the subcontract agreement contains such a requirement, First Mercury asserts § 56-7-1 renders that provision void and therefore the agreement cannot serve as the "written contract" required to make Bingham an additional insured under the First Mercury Policy.

The district court rejected that argument, holding instead that although § 56-7-1 voids the Subcontract Agreement's provisions requiring High Desert to indemnify Bingham for Bingham's own negligent acts and omissions, it does not invalidate the subcontract agreement's provisions requiring High Desert to add Bingham as an additional insured on a general commercial liability insurance policy. *First Mercury*, 2016 WL 7494286, at *8–*10. The district court also concluded that § 56-7-1 does not invalidate the Additional Insureds Endorsement because the endorsement does not purport to cover or indemnify Bingham for its own acts or omissions. *Id.* As a result, the district court determined that notwithstanding § 56-7-1, Bingham was a named insured under the First Mercury Policy.

Section 56-7-1(A) provides that a

provision in a construction contract that requires one party to the contract to indemnify, hold harmless, insure or defend the other party to the contract . . . against liability . . . arising out of bodily injury to

14

persons or damage to property caused by or resulting from, in whole or in part, the negligence, act or omission of the indemnitee, . . . is void, unenforceable and against the public policy of the state.

N.M. Stat. Ann. § 56-7-1(A); *see also Sierra v. Garcia*, 746 P.2d 1105, 1107 (N.M. 1987) (reviewing an earlier, but similar, version of § 56-7-1 and noting it "voids agreements which attempt to indemnify the indemnitee for liability resulting, *in whole or in part*, from the indemnitee's negligence"). The statute clarifies the terms "indemnify" and "hold harmless" include "any requirement to name the indemnified party as an additional insured in the indemnitor's insurance coverage for the purpose of providing indemnification for any liability not otherwise allowed in this section." N.M. Stat. Ann. § 56-7-1(F).

The parties do not dispute the district court's assessment that the subcontract agreement's provisions requiring High Desert to indemnify Bingham for Bingham's own acts and omissions are unenforceable under and voided by § 56-7-1(A).[4] But

---

[4] Relying on the well-established New Mexico contract principle that, where a contract or contract term is unenforceable, a court may refuse to enforce the contract, enforce the remainder of the contract, or limit the application of the unenforceable term, *Rivera v. Am. Gen. Fin. Servs., Inc.*, 259 P.3d 803, 819 (N.M. 2011), the district court determined that other provisions of the subcontract agreement, including the requirement to make Bingham an additional insured, were enforceable.

The text of the statute supports the district court's decision to void certain provisions of the agreement without voiding the entire contract. As stated in § 56-7-1(A), an offending "*provision* in a construction contract" is void, as opposed to the entire contract. But this language and the district court's order appear somewhat at odds with at least two New Mexico Supreme Court decisions. *See Safeway, Inc. v. Rooter 2000 Plumbing & Drain SSS*, 368 P.3d 389, 400–02 (N.M. 2016) (examining a contractual agreement in light of a prior version of § 56-7-1 and noting that "*Sierra* [*v. Garcia*, 746 P.2d 1105 (N.M. 1987)] made clear that the anti-indemnity statute voids the entire contractual agreement, not merely part of it, when the clause requires the indemnitor to indemnify the indemnitee for the indemnitee's own negligence").

without any explanation or reference to § 56-7-1(F), which states that "indemnify" includes "any requirement to name the indemnified party as an additional insured in the indemnitor's insurance coverage," the district court then determined that the subcontract agreement's provision "requiring High Desert to add Bingham as an additional insured is not contrary to" § 56-7-1. *First Mercury*, 2016 WL 7494286, at *8. The plain language of the subcontract agreement, however, includes obligations prohibited by § 56-7-1(A) and (F), as it provides that Additional Insured status shall include coverage for completed operations, ongoing operations and for the concurrent or *sole negligence* of Contractor [Bingham], the Owner, and their respective parent companies, subsidiaries, and affiliated companies." App. III at 250–51 (emphasis added). Accordingly, to the extent that the subcontract provisions requiring High Desert to name Bingham as an additional insured include an obligation to indemnify Bingham from its own negligence, the provisions are void, unless one of § 56-7-1's exceptions applies.

Cincinnati argues on appeal that the subcontract agreement's provisions requiring High Desert to add Bingham as an additional insured, including the

First Mercury did not raise this argument on appeal. This is likely because *Safeway* and *Sierra* were based on the pre-2003 version of § 56-7-1. *See Safeway*, 368 P.3d at 401. Section 56-7-1 was amended in 2003 to add § 56-7-1(B), which, as discussed below, provides for exceptions to the voiding of offending provisions. *See Holguin v. Fulco Oil Servs. L.L.C.*, 245 P.3d 42, 50 (N.M. Ct. App. 2010) (noting that the 1971 version of the statute did not include the language of 56-7-1(B) and that "56-7-1(B) specifically permits enforcement of an indemnity clause to the extent that it provides for indemnification from the indemnifying party's negligence"). Thus, it appears that the holding in *Sierra* as reaffirmed in *Safeway* is limited to the pre-amendment versions of § 56-7-1 and has been superseded by statute with the amendments to § 56-7-1.

obligation to insure Bingham from its own negligence, fall under the exception identified in § 56-7-1(B)(2) and thus does not run afoul of § 56-7-1(A), (F).[5] We agree.

Section 56-7-1(B)(2) provides:

> B. A construction contract may contain a provision that, or shall be enforced only to the extent that, it:

> (2) *requires a party to the contract to purchase a project-specific insurance policy*, including an owner's or contractor's protective insurance, project management protective liability insurance or builder's risk insurance.

N.M. Stat. Ann. § 56-7-1(B) (emphasis added). Cincinnati contends the subcontract agreement falls within subsection (B)(2) because the agreement plainly requires the purchase of a "project-specific insurance policy," as evidenced by the fact that (1) the subcontract agreement requires procurement of insurance and the naming of Bingham as an additional insured in relation to the work being performed by High Desert on construction of the tractor supply store in Farmington, New Mexico, and (2) the First Mercury Policy procured by High Desert reflects project-specific coverage. We agree that the subcontract agreement requires High Desert to purchase a project-specific insurance policy.

---

[5] Cincinnati raised this argument below, but the district court did not address it in its summary judgment order. However, "[w]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *Medina v. City & Cty. of Denver*, 960 F.2d 1493, 1495 n.1 (10th Cir. 1992) (citations and internal quotation marks omitted).

17

Neither § 56-7-1 nor New Mexico case law clarify the meaning of a "project-specific insurance policy." As such, its application here presents an issue of first impression. Under New Mexico law, "when a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Safeway, Inc. v. Rooter 2000 Plumbing & Drain SSS*, 368 P.3d 389, 400 (N.M. 2016). We "also look at the overall structure and function of the statute, as well as the public policy embodied" therein. *Id.*

The subcontract agreement itself is expressly project-specific. It provides the terms and conditions for High Desert's roofing services specific to the construction of the tractor supply store in Farmington, New Mexico. But it must require High Desert to procure a "project-specific insurance policy," as opposed to a more generalized liability policy. The insurance and indemnity conditions required by the agreement are set forth in Article 12, which states in relevant part that "[b]efore commencing any of its work under this [agreement], and until completion and final acceptance therefore by Contractor and Owner, [High Desert] shall maintain at its expense such insurance as will protect it from the claims arising out of its operations and the expiration of the period described below." App. III at 250. The subcontract agreement continues, indicating that as "a condition precedent to payment for the Work [(roofing services on the building)], [High Desert] shall provide a certificate of insurance evidencing the coverages set forth" in the agreement. *Id.* The agreement also provides that "[t]he insurance coverage required under . . . [A]rticle [12] shall be of sufficient type, scope, and duration to ensure coverage for the Contractor or

18

Owner for liability related to any manifestation date within the applicable statute of limitations which pertain to any work performed by or on behalf of the Contractor or Owner in relation *to the work under this [agreement].*" *Id.* (emphasis added). Finally, the agreement's language regarding indemnification requires High Desert to indemnify various individuals and organizations for claims resulting or arising from, or relating to or concerning, High Desert's performance "of the [agreement] or the subcontract work." *Id.* at 251–52.

Although the subcontract agreement contains language requiring High Desert to obtain a broad range of insurance coverage, the language of the agreement is most reasonably read as requiring insurance specific to High Desert's and Bingham's work on the tractor supply building. In particular, the agreement's requirement that the coverage obtained by High Desert "be of sufficient type, scope, and duration to ensure coverage . . . for liability related . . . to any work performed . . . in relation to the work under this" subcontract agreement suggests that the agreement requires procurement of a "project-specific insurance policy." *Id.* at 250; *see PIC Group, Inc. v. LandCoast Insulation, Inc.*, 718 F. Supp. 2d 795, 803 (S.D. Miss. 2010) (examining a similar exception in Georgia's anti-indemnity statute and holding that a contractual requirement to procure a policy to cover "the performance of this Agreement or any Purchase order" was a project-specific insurance requirement). The requirement that High Desert obtain a policy "before commencing any of its work" under the agreement and "until completion and final acceptance" of the work

19

supports the conclusion that the insurance policy required by the subcontract agreement was specific to the work on the tractor supply store. App. III at 250.

First Mercury does not argue otherwise. Instead, it contends that under § 56-7-1(B)(2) we are required to examine whether the procured policy is a project-specific policy, as opposed to whether the relevant construction contract requires a project-specific insurance policy. We disagree. The plain language of § 56-7-1(B)(2) applies the exception to a "construction contract" that "requires a party to the contract to purchase a project-specific insurance policy." Thus, the relevant inquiry is not whether the procured insurance policy is ultimately project-specific, but whether the underlying construction contract requires a project-specific policy.

Because the Subcontract Agreement's provisions requiring High Desert to name Bingham as an additional insured fall within the exception listed in § 56-7-1(B)(2) as a construction contract requiring a party to purchase a project-specific insurance policy, the provisions are valid under New Mexico law. Thus, Bingham is an additional insured under the First Mercury Policy.

### B. *First Mercury's Duties to Defend and Indemnify*

First Mercury also contends that its policy does not provide Bingham coverage for the underlying lawsuit because the complaint alleges only that Bingham was negligent. First Mercury reasons that its policy covers Bingham only to the extent the complaint in an underlying lawsuit alleges that Bingham is liable for the acts or omissions of High Desert or someone acting on behalf of High Desert.

20

The parties do not distinguish between First Mercury's duty to defend and its duty to indemnify under the First Mercury Policy, but under New Mexico law those duties are triggered in different circumstances. *See City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 213 P.3d 1146, 1155 (N.M. App. 2009) ("[T]he duty to indemnify is distinct from the duty to defend, and resolution of whether a party has a duty to defend does not necessarily depend on there being a duty to indemnify." (internal quotation marks omitted)). The "duty to defend arises out of the nature of the allegations in the complaint," *Miller v. Triad Adoption & Counseling Servs., Inc.*, 65 P.3d 1099, 1103 (N.M. App. 2003), and is ultimately "determined by comparing the factual allegations in the complaint with the insurance policy," *Lopez v. N. M. Pub. Sch. Ins. Auth.*, 870 P.2d 745, 747 (N.M. 1994). "If the allegations of the complaint or the alleged facts tend to show that an occurrence comes within the coverage of the policy, the insurer has a duty to defend regardless of the ultimate liability of the insured." *Miller*, 65 P.3d at 1103. In addition to the allegations contained in the complaint, "[k]nown but unpleaded facts may bring a claim within the coverage of the policy at the beginning of the litigation or at a later stage." *Id.* In contrast, the duty to indemnify relates to liability actually imposed on the insured— "[i]f the allegations of the . . . complaint clearly fall outside the provisions of [the relevant] insurance policies, indemnity by the insurer is not required," *N.M. Physicians Mut. Liab. Co. v. LaMure*, 860 P.2d 734, 737 (N.M. 1993).

The relevant provision of the First Mercury Policy, the Additional Insured Endorsement, provides in part:

21

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" *caused, in whole or in part*, by:

 **1.** Your [High Desert's] acts or omissions; or

 **2.** The acts or omissions of those acting on your [High Desert's] behalf;

in the performance of your [High Desert's] ongoing operations for the additional insured(s) at the location(s) designated above.

App. I at 106 (emphasis added). For purposes of this argument, the parties agree that "your" refers to High Desert and that the district court was correct in concluding this language limits First Mercury's coverage of Bingham to "claims for bodily injury or property damage [that] are the result of the acts or omissions of High Desert (or those acting on its behalf), and not for acts or omissions of [Bingham]." *First Mercury*, 2016 WL 7494286, at *6.

## 1. Duty to Defend

First Mercury argues that under New Mexico law, its policy covers Bingham only to the extent the *complaint* alleges High Desert was negligent and that Bingham is vicariously liable or jointly and severally liable for High Desert's negligence. We disagree. The New Mexico Supreme Court has held that "[t]he duty of an insurer to defend arises from the allegations on the face of the complaint *or from the known but unpleaded factual basis of the claim* that brings it *arguably* within the scope of coverage." *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 799 P.2d 1113, 1116 (N.M. 1990) (emphasis added); *see also Sw. Steel Coil, Inc. v. Redwood Fire & Cas.*

22

*Ins. Co.*, 148 P.3d 806, 812 (N.M. Ct. App. 2006) ("If the duty to defend does not arise from the complaint on its face, the duty may arise if the insurer is notified of factual contentions or if the insurer could have discovered facts, through reasonable investigation, implicating a duty to defend."); *G & G Servs., Inc. v. Agora Syndicate, Inc.* 993 P.2d 751, 757–58 (N.M. Ct. App. 1999) (noting that "facts other than those set forth in the complaint may also implicate an insurer's duty to defend" and that an insurance company "cannot construct a formal fortress of the third party's pleadings and retreat behind its walls").

Furthermore, the First Mercury Policy expressly states that additional insureds are covered for bodily injury "caused, in whole or in part," by High Desert's acts or omissions or the acts or omissions of someone acting on High Desert's behalf in the course of performing its work under the subcontract agreement. App. I at 106. This language plainly extends coverage beyond underlying lawsuits in which a plaintiff expressly raises claims against High Desert, requiring only that High Desert's acts or omissions have some causal relationship to the injury.

To be sure, the complaint in the underlying lawsuit named only Bingham as a defendant and claimed Bingham's negligence alone caused Mr. Corona's death. But Bingham argued, as part of its defense, that additional evidence demonstrated Mr. Corona's injuries and death were caused, at least in part, by (1) his own negligence—falling through the hole while lifting the plywood covering, failing to use fall protection, and failing to use ordinary care while walking on an elevated surface with knowledge there was a hole in the surface, and (2) High Desert's negligence—

23

directing Mr. Corona to investigate the hole without requiring him to wear fall protection. Because these additional facts and the defense raised by Bingham implicate acts or omissions of High Desert or its employee, the underlying lawsuit falls within the scope of coverage of the First Mercury Policy. The district court was therefore correct that Bingham was entitled a defense in the underlying lawsuit provided by First Mercury.

## 2. Duty to Indemnify

As noted above, the duty to indemnify relates to liability actually imposed on the insured. Once liability has been imposed, if the claims fall outside the policy's coverage, there is no duty to indemnify. The duty to indemnify can be viewed as an endpoint of the duty to defend—an "insurance company ha[s] a duty to defend *until* it [can] be determined *in the primary action*" that the lawsuit falls outside of the protection provided by the insurance policy. *Lopez*, 870 P.2d at 748. Because the lawsuit settled, the duty to indemnify must be determined by the facts as established at the time of settlement and on the basis of the settlement.[6]

---

[6] In a declaratory judgment action between two insurers, the New Mexico Supreme Court noted that it "d[id] not have the luxury . . . of analyzing the facts surrounding the occurrence of the accidents . . . to determine which insurer was primarily liable, for the[] suits were settled before trial" and it had to resolve the issue "on the basis of the allegations in the third party complaints." *Am. Emp. Ins. Co. v. Cont'l Cas. Co.*, 512 P.2d 674, 677–78 (N.M. 1973). Other courts have similarly looked to the settlements and the facts established prior to settlement to determine the duty to indemnify. *See, e.g.*, *Bankwest v. Fidelity & Deposit Co. of Md.*, 63 F.3d 974, 978 (10th Cir. 1995) (applying Kansas law and noting that "the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means (*e.g.*, summary judgment or settlement).."); *Travelers Ins. Co. v. Waltham Indus. Laboratories Corp.*, 883 F.2d

The policy states that it covers liability "caused, in whole or in part, by [High Desert's] actions or omissions." App. I at 106. It is possible that, had the trial in the wrongful death lawsuit proceeded, the finder of fact would have found that Mr. Corona's death was not caused by High Desert's actions or omissions. In that situation, any liability imposed on Bingham would not fall within the additional insured coverage provided by the First Mercury Policy. And in those circumstances First Mercury would have no duty to indemnify Bingham. But the lawsuit was settled without apportionment of fault between the parties, extinguishing further liability for both Bingham and High Desert. Without some finding to the contrary, and based on the defenses implicating High Desert raised by Bingham, First Mercury had a duty to indemnify Bingham.

## C. *The First Mercury Policy is Primary*

First Mercury next contends that even if it had a duty to defend and a duty to indemnify, the district court erred in concluding its policy was primary. In support, it relies on the policies' "Other Insurance" provisions, which govern the obligations of each insurer when multiple policies apply to the underlying lawsuit or occurrence. According to First Mercury, the provision in the Cincinnati policy irreconcilably

---

1092, 1099 (1st Cir. 1989) ("[A]n insurer's obligation to defend is measured by the allegations of the underlying complaint while the duty to indemnify is determined by the facts, which are usually established at trial. Here, however, the cases were settled prior to trial. This means that the duty to indemnify must be determined in the basis of the settlement. . . ."); *Union Ins. Co. v. Delta Casket Co.*, 2010 WL 11493657, at *13 (W.D. Tenn. July 30, 2010) (listing cases and noting that "the Court looks to the potential for liability and the facts as they existed when the claim was settled in determining whether [the insurer] had a duty to indemnify.").

conflicts with the provision in the First Mercury policy as to which policy is primary and how financial obligations are apportioned. First Mercury contends that when such a conflict occurs, New Mexico requires, under *CC Housing v. Ryder Truck Rental*, 746 P.2d 1109 (N.M. 1987), the insurers to "contribute on a pro-rata basis determined by their respective [policy] limit[s]." Appellant Br. 17. By First Mercury's calculation, Cincinnati should have paid either 85.7% or 83.3% of the first $1 million contributed by First Mercury. *Id.* at 14, 17.[7]

First Mercury's argument fails at its inception, however, because the provisions in the two insurance policies are not in conflict. Each policy makes clear that First Mercury is the primary insurer and that Cincinnati is an excess insurer. The Cincinnati Policy states:

> **b. Excess Insurance**
>
> This insurance is excess over:
>
> . . . .
>
> **(2)** *Any other primary insurance available to the insured* [Bingham] covering liability for damages arising out of the premises or operations, or the products and completed operations, *for which the insured [Bingham] has been added as an additional insured by attachment of an endorsement.*
>
> **(3)** Any other insurance:

---

[7] First Mercury calculated the percentages by dividing each insurer's respective policy limit by the sum of the policy limits in both policies. Using the $6 million limit for Cincinnati, Cincinnati's pro-rata obligation would be $6 million divided by $6 million plus $1 million, which equals 85.7%. Using the $5 million limit for Cincinnati, Cincinnati's pro-rata obligation would be $5 million divided by $5 million plus $1 million, which equals 83.3%.

26

> **(a)** Whether primary, excess, contingent or on any other basis, except when such Insurance is written specifically to be excess over this insurance . . .

App. I at 91–92 (emphasis added).

First Mercury's "Primary and Non-Contributing Insurance" endorsement, which completely replaces the policy's "Other Insurance" section, does not conflict with Cincinnati's excess insurer status. Rather, that endorsement provides it will follow a contribution-by-equal-share approach if permitted by all other insurance policies "unless the insured is required by written contract signed by both parties, to provide insurance that is primary and noncontributory" and "[w]here required by a written contract signed by both parties, this insurance will be primary & non-contributing only when and to the extent as required by that contract." App. II at 179. The subcontract agreement between High Desert and Bingham provided just such a requirement, stating: "The insurance policies . . . shall be endorsed to add [Bingham], the Owner and their parent companies, subsidiaries and affiliated companies as additional insureds on a *primary and non-contributory basis* . . . . The insurance carried by [High Desert] naming [Bingham] and the Owner as additional insureds *shall be primary* over any insurance policies carried by [Bingham] and the Owner." App. III at 250 (emphasis added). Thus, contrary to First Mercury's arguments, the policies do not conflict.

The combination of the First Mercury Policy and the subcontract agreement make the First Mercury Policy primary over the Cincinnati Policy. The Cincinnati Policy is expressly excess over any policy in which Bingham is named as an

27

additional insured. Because the subcontract agreement requires the policy procured by High Desert to be primary and non-contributory, the district court correctly held that the First Mercury Policy is the primary policy.

### D. *Cincinnati's Duties to Defend and Indemnify*

First Mercury also contends it is entitled to the apportionment of defense costs even if it has a duty to defend Bingham and its policy is primary. First Mercury further argues it is entitled to reimbursement from Cincinnati of all defense costs incurred on or after December 17, 2014, when it offered its policy limits in settlement. First Mercury's arguments are unavailing.

## 1. Duty to Defend

In support of its first argument, First Mercury asserts that excess insurers like Cincinnati may still have a duty to defend if their policy so requires, and that under New Mexico law, when "there are two insurers each with a duty to defend, one of which refuses to defend, the defending insurer has a right of apportionment of expenses and outlays with the other insurer in proportion to the insurance carried." *Am. Emp. Ins.*, 512 P.2d at 679. First Mercury argues the Cincinnati Policy makes no distinction with respect to its duty to defend based on its position as a primary or excess policy and therefore Cincinnati is required to reimburse First Mercury for its portion of Bingham's defense costs. But contrary to First Mercury's assertion, the Cincinnati Policy expressly states that "[w]hen this insurance is excess, we will have no duty . . . to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit.'" App. I at 92. Under this provision, Cincinnati had no duty to defend Bingham because, as

previously established, the First Mercury Policy is primary and the Cincinnati Policy is excess. Therefore, the district court was correct in holding that Cincinnati has no obligation to reimburse First Mercury for defense costs from the date Cincinnati tendered the defense to First Mercury, or otherwise.

First Mercury also contends its duty to defend ceased—and Cincinnati's began—when First Mercury offered to pay its $1 million policy limit toward settlement of the underlying lawsuit. But the language of the First Mercury Policy undermines this argument. In relevant part, the policy provides that First Mercury's "right and duty to defend ends when [it] ha[s] used up the applicable limit of insurance *in the payments of judgments or settlements*." *Id.* at 94 (emphasis added). First Mercury's duty to defend ceases when it has "used up" its limit; its duty is not extinguished merely by *offering* to pay its policy limit toward a settlement. Accordingly, First Mercury's duty to defend did not terminate until it paid its portion of the settlement and so the district court was correct that First Mercury has no right to reimbursement or contribution for the cost of defending Bingham after the offer of settlement.

## 2. Duty to Indemnify

Under the Cincinnati Policy, Cincinnati's duty to indemnify Bingham, as an excess insurer, extends to "the amount of the loss, if any, that exceeds . . . [t]he total amount that all such other insurance would pay for the loss in the absence of this insurance." *Id.* at 92. In this case, Cincinnati is required to pay the amount of the settlement that exceeds the coverage limit of the First Mercury Policy. Because the settlement amount was $4.2 million and the First Mercury Policy limit was $1

million, Cincinnati was required to pay $3.2 million. Cincinnati has paid this amount and thus has no obligation to reimburse First Mercury for any of the indemnification costs.

Because the First Mercury Policy is primary over the Cincinnati Policy with respect to the duty to defend and the duty to indemnify, Cincinnati has no obligation to reimburse First Mercury for any of the defense or settlement costs.

### III.  CONCLUSION

We AFFIRM the district court's order granting summary judgment in favor of Cincinnati. We therefore do not consider Cincinnati's conditional cross-appeal.